3, 10, 0, 6, 5, 8. People of the State of Illinois. Appellee Gary Ganinovic v. Tyrone Hopkins. Appellant Thomas Corrales. Good afternoon. Good afternoon. I please the court, counsel. I'm Tom Corrales and I represent the defendant, Tyrone Hopkins. Mr. Hopkins was convicted of first degree murder and a related weapons possession offense after a bench trial in Peoria County. That was held in June of 2010. He was sentenced to concurrent prison terms of 65 and 10 years. And this is his direct appeal in which we've raised two issues. Our primary argument challenges the sufficiency of the evidence to convict Mr. Hopkins of the murder. And in the second argument we're asking this court to reverse the convictions and to remand for a new trial due to a violation of defendant's right to present evidence of another person's admission that he committed the shooting. And that issue I'll simply refer to as the chamber's argument. Now this is a very fact-intensive case and even a short run-through of the relevant facts would eat up a good portion of my time. I've attempted to fully set forth all of the facts in our opening brief and I've tried to comprehensively show the weaknesses in the state's case. That case consisted of multiple personal vendettas and a love triangle that consisted of my client, Tyrone Hopkins, and his lifelong female partner, Lakeisha Brown, and an ex-lover of Lakeisha's whose name is Robert Williams. And the feud, which is basically what this was, culminated at the home of a relative of Robert Williams's whose name is Margaret Williams. As the court knows, the victim in this case was Margaret's brother, Lonnie, who was killed when shots were fired in the front yard of Margaret's home, just as my client and Robert Williams appeared to be squaring off to fight each other. Now I'm going to focus my time here this afternoon on the chamber's argument. I'll have some comments dealing with the prejudice that resulted from the chamber's ruling. And to that extent, some of that discussion would also apply to the reasonable doubt argument. But in terms of a roadmap, I don't intend to spend any time discussing the reasonable doubt argument unless the court wants to ask some questions about that. The first aspect of the chamber's argument that needs to be addressed is what standard of review should govern that issue. The trial judge in this case did not apply the factors that this court will be looking at when he determined whether evidence of Sam Traft's verbal admission to being the shooter in this case should have been allowed in a trial. And without disputing that fact, the state nevertheless asked that the traditional abuse of discretion standard be applied rather than the de novo standard. But since the trial judge here revealed that he didn't apply the full chamber's test when he said he knew of no exception under which the Traft's statements could be admitted, then to grant deference to the lower court here would keep the proposed testimony about Traft's statements from ever being subject to a meaningful assessment under the chamber's factors, either in this court or, of course, in the trial court. So in a nutshell, that's why it's proper to apply the de novo standard of review here. In terms of the substance of the argument under chambers, we really don't have a lot in dispute other than what the outcome should be after plugging in the pertinent factors. One thing I would like to draw attention to about the test for admission of these out-of-court declarations is a very specific type of cooperation that was present in this case and was also present in chambers, which the state has not addressed in its brief. But I'll begin by just pointing to the four tests that are outlined in chambers, which are a guideline to ascertain whether sufficient indicia of trustworthiness of these out-of-court declarations exist. And those four factors are that the statement was made spontaneously to a close acquaintance shortly after the crime. Two, that the statement or statements were corroborated by other evidence. Three, that the statement was self-incriminating and against the declarant's interests. And then fourth, an adequate opportunity for cross-examination of the declarant. And it's not in dispute in this case that it's not required to have all four factors present in order to admit the testimony of the out-of-court admissions. What I mention as the not enumerated factor that the chambers court pointed out as a further indicator of trustworthiness is the raw number of independent instances of confessions by this non-charged party. In the chambers case, the defense wanted to call three different witnesses who were going to relate what they were told by this person named McDonald on different occasions. And the court mentioned that the multiple confession accounts was an additional reason on top of things like the proximity to the time of the crime, the spontaneity of the confessions, and the corroborating evidence that was heard at trial. And we have multiple instances, too, during which Sam Trapps had taken responsibility for committing this crime. In fact, my client's case bears a lot in common with the chambers case. Both of the cases involve shootings that occurred in the midst of a large group of individuals. In the place of the person named McDonald in the chambers case was the man known as Sneeze, whose real name is Sam Trapps in our case. There was evidence that Sam was at the scene when Lonnie Williams was shot in this case. In fact, there were a number of witnesses who testified that they saw him firing a gun. This mirrored the testimony from the chambers trial in relation to the person named McDonald, who was seen in possession of the same caliber weapon as the murder weapon on the night that the victim was shot in that case. And the defendant here was ready to call more than three separate witnesses, which was the number in chambers. Two of our witnesses would have testified that around 24 hours after the shooting they heard Sam Trapps confess that he was the shooter. And Sam came to the defendant's mother's house for the first time shortly after the defendant had been taken into custody, and he was assuring the defendant's mother that Tyrone could not have done the crime. In total, we offered five different individuals who were prepared to testify about three different instances of Sam admitting that he had shot Lonnie Williams. In both cases, clearly the statements were incriminating. So three out of the four factors from chambers, including the multiple instances of confessions, were present in favor of admitting the out-of-court statements. The only one that we're missing is whether or not the declarant was available to be cross-examined. And the reason for that, I should point out, I think it's indicated in our opening brief as well, was due to Sam Trapps failing to honor the subpoena that he was served to appear as a witness by the state. And the state had a warrant outstanding for his arrest at the time of my client's trial, which it was unable to execute. So we weren't able to meet that cross-examination factor, but that was due to Sam Trapps not wanting to be in the courthouse during the trial. Now, the testimony relating to Sam Trapps' admissions was absolutely vital to the defendant in this case. In both chambers and our case, there were a number of witnesses who could see the charged defendant when the shot that killed the victim was fired, and they testified that the defendant did not have a gun at that time. But that's not a substitute for testimony that another person admitted that he, in fact, did the shooting. As in chambers, the ruling in our case prevented Mr. Hopkins from calling any of the witnesses who were prepared to describe an alternative suspect who admitted his guilt. And so it precluded the defendant from presenting a full defense to the charge. The only remaining question here is whether or not the state can show that harmless error was the result. And I'll touch on this, and as I emphasized in the reply brief, these facts will overlap to an extent with the reasonable doubt argument. But, of course, the inquiry for harmlessness under Issue 2 is different than the reasonable doubt issue, primarily based on the fact that it's the state's burden in Issue 2 to prove beyond a reasonable doubt that this error could not have resulted in the defendant being found guilty. The state has made the argument that the identity of my client as the shooter of Lonnie Williams was adequately established and would not have been affected even by the testimony about Sam Trapp's confessions. The eyewitness testimony of the state's witnesses, especially that of Margaret Williams, was severely impeached. In fact, I think a proper description of Margaret's testimony would be to say that she wanted the judge, who was the trier of fact here, to believe that she saw the defendant pull a gun out and shoot Lonnie. But her testimony just didn't stand up to the impeachment that followed. There was a detective named Burwell who had spoken to Margaret Williams and impeached Margaret's testimony by revealing over the denials of Margaret, which she was questioned by a defense counsel, that Lonnie must have seen who had pulled the trigger because I didn't see. She also gave a sequence of the shots, which was totally out of sync with everybody else's indication in this case. She testified that there was a shot that went whizzing by her head, and then there were other shots, including the one that killed Lonnie. By all the other accounts, the first shot that was fired struck and killed Lonnie. Then there was a pause, and then there were a number of other shots that went at the house, and one of them struck a person named John Thomas as he was making his way back into the house. So Margaret's sequence could not have happened that way unless all the other witnesses who testified were off in their sequence and timing regarding the shot that struck Lonnie. And the other important thing is that Margaret Williams was impeached by her disclosure to the same detective that she did see someone come from the side of her house who wore a hoodie and was firing a gun. And that person was obviously Sam Trapps. Other witnesses were able to see my client at the very time that Lonnie was shot, and they indicated that he was not armed. Or if he was armed, it was with a baseball bat or a golf club. And that included Margaret's cousin, Robert Williams, who was the one that should have been keeping the closest eye on my client because those were the two people that were about to duke it out. And even Robert said the defendant wasn't possessing a gun when he saw him. So if the denial of the other party admission testimony was not harmless in Chambers itself, it could not have been harmless in this case either. Now, I've only focused on the second issue, but I would really urge that Your Honor scrutinize the first issue, which I think presents very sketchy evidence and is one of the stronger reasonable doubt arguments in a murder case that I've seen in over two decades. Counsel, that's two minutes. Thank you. But if the murder conviction is not reversed outright based on the first issue, then the denial of the defendant's right to present a defense, as we've shown in the second issue, should result in this Court reversing his convictions and ordering a new trial in Peoria County. Any questions? Thank you. No. Thank you. Mr. Ganinovic? May it please the Court, Counsel? I'm going to kind of do this in a little bit of reverse order, what Counsel did, because it kind of leads into what ends up being the combined issue here concerning reasonable doubt and whodunit. As far as the reasonable doubt argument is concerned, the people would submit that there was adequate evidence that was presented. We had the testimony from three state eyewitnesses who positively identified the defendant at the shooting, Margaret Williams, Deborah Guyton, and Sherry Williams. I did take a comment in my brief about Kenesha Clements having a conversation with Lakeisha Brown before the shooting, in which Brown told Clements that it's going to be the Browns versus the Williams and my man Bees, who's the defendant, had a gun. In addition to that, we also had taped statements from Malarga Sanchez, who was the defendant's cousin, as well as Reggie Coleman, who was an eyewitness, both of whom who spoke to police shortly after the crime. That would be on the night of the occurrence. Their statements were taped, and in there Malarga Sanchez made a statement on March 31st at around 6.50 a.m. that he witnessed the defendant raise his hand from the victim and saw the defendant shoot the gun four to five times. On April 1st at around 6 o'clock, he made a second statement to the police indicating what he had witnessed, the fact that, once again, he identified the defendant as the individual who shot. Reggie Coleman gave a videotaped statement, told police three times he saw the defendant shoot the victim, and even acted out on the tape how the defendant did it. So in this case, the trial judge, making his findings, he observed that the question, more so in dealing with the post-trial motions, he said that the case in part came down to the eyewitness testimony and their credibility. The trial judge found these witnesses credible. He particularly found the defendant's own cousin, who basically identified the defendant, to be of significant import. The aspect of the reasonable doubt argument that I wish to take a focus on, that kind of ties in with the first and second issue here, is the fact that the defendant, in his reply brief, cries that we haven't had a level playing field, because the state got to take a certain hearsay testimony and I didn't. Well, the rules of evidence are such that, with respect to the hearsay that the people prefer, especially the hearsay from the defendant, as to what the defendant had said, that is admissible as an admission by a party opponent, or as a statement by a party opponent. In this case, what the defendant wanted to admit, he wanted to admit statements from individuals who said that Sandtrap admitted killing the victim. He says, and he claims he was deprived of presenting his defense. Yet, the defendant doesn't cite, and he didn't make any comment about it here today, about the fact that he was, in essence, able to present his defense to the trial judge about Sandtrap. Tyrone Hopkins Jr., Beryl Brown, Brianna Brown, or Lucy, and Tyrone Hopkins Sr., the defendant himself, all four testified to the fact, eyewitness testimony now, not hearsay, eyewitness testimony, that Sandtrap is the one who pulled the gun. Sandtrap is the one who shot the victim. Defendant did not have a gun in his hand. Defendant presented his defense without the hearsay. So, what was the basis of the trial judge's ruling? The basis of the trial judge's ruling was the fact that, with respect to this hearsay, with respect to this Chambers issue, the problem that he had, and the reason why he rejected the defense, was, first of all, the fact that the four eyewitnesses all had an opportunity, at some point in time, at the time of the shooting, at the time of the trial, to come forth and say something. They said nothing. The trial judge found this to be totally incredible. You've got this individual, you've got this family member, in jail, charged with murder, and you don't come forward and say anything? In fact, I believe it was Lucy even testifying at trial. This was the first time she was really telling anybody anything about this. Incredible. So, the trial judge found that the defense just, it was no good. It was totally unbelievable. So, we add into that now, well, the fact that defendants claiming it was god-awful prejudicial, that I wasn't allowed to take and bring forth my defense, and the state was allowed to do this, and the state was allowed to do that. First of all, he presented his defense. It was found to be totally incredible. And the facts bear that out. The record bears that out. Argues that it's just totally incredible. It's god-awful that I wasn't able to produce these hearsay statements. Again, the hearsay statements are from family members. I'm not exactly sure of the family relationship, but I believe the one might have been the mother of the defendant, or if not, was the mother of whoever he was, the relationship he was having. But the fact is, none of them came forward. They supposedly heard this within a reasonable time period. None of them came forward and said anything. What is a reasonable time period under Chambers? Well, I don't really know. My opinion, based on the case law, first of all, 11 or 12 days afterwards, I don't think is a reasonable time period. And quite honestly, I don't recall anyone saying that Sam Traft had said something within 24 hours. Counsel here today made the argument that someone came forth and said that they heard that Traft had committed this. Well, saying that someone heard this and saying that Sam Traft said that are two different things. So if somebody heard that Sam Traft had allegedly admitted to killing, that is different to saying that those words actually came from Sam Traft. But the two time periods that I have here are 4-11 or 4-12, and sometime in August, whenever that is. I don't think that is the kind of spontaneous, the kind of spontaneity that is needed in order to have credibility, in order to say that these statements are trustworthy. And as much as counsel here is trying to argue an additional fact, which is how many times it was repeated, well, I guess if you pity the poor defendant who has somebody who allegedly claims that they shot somebody or did something, instead of the defendant, and only said the statement in front of one or two people, as opposed to the whole congregation in a church. Because if the whole congregation can tell you this, then according to defense counsel, that is way more credibility, way more trustworthy than if you just repeat it to one person. Which I don't think the case law necessarily supports that. That just happens to be a factual circumstance in each particular case. I think if you say something to one person, and that one person comes forward under the circumstances it's credible, I think it's going to come in. I don't care if it's one person, I don't care if it's a hundred people. But the thing is, is the fact that if you then factor in, as much as counsel talks about the repetitiveness, if you factor in, what did the trial judge already find? The trial judge already found that the eyewitnesses who were there, who saw, who observed, who basically testified, if they weren't believable, why in the world is the trial judge going to be able to take and find that these hearsay statements of people who likewise didn't come forward, who claimed not to have seen the shooting, not seen who shot whatever, how is he going to find them to be credible? Especially since they didn't come forward at all either, until sometime shortly prior to trial. My point is, is the fact that, first of all, under the facts of this case, the state's evidence is more than ample to prove the defendant guilty beyond a reasonable doubt. The trial judge didn't take and say, I want to find them guilty or not guilty, based upon whether or not I believe the defendants. For the most part, his initial point was, were the state witnesses credible? He found their testimony credible, he found it consistent, he found the facts and evidence of everything that came out to be totally consistent, and he found the fact that they came forward immediately and gave their observations, added to their credibility. He then basically went along with what the defense was. He rejected the defense specifically in response to the post-trial motion. I would venture to say that because he found the eyewitness testimony incredible, I don't think that the hearsay testimony is going to add any weight to testimony that he finds is contrived to begin with, because of the fact that family members never came forward until then. Didn't tell the police, didn't tell the prosecutor, didn't tell the defense counsel, didn't tell anybody anything about what went on. Under the facts of this case, if, if by chance there's any error, the trial judge is ruling, and by the way, I do think that the abuse of discretion standard should apply, simply because the trial judge ruled the way he did doesn't mean he didn't consider Chambers, but frankly, I don't care which standard you use, even if you go with DeNovo, the fact of the matter remains, in this particular situation, these, this hearsay statement, under Chambers, the four factors, and the consideration of total evidence, there's no way that these statements bear any indicia of trustworthiness. But if there was error, considering what the trial judge held, error's got to be harmless, because if he didn't believe the eyewitness testimony, the trial judge certainly is not going to take and believe hearsay testimony. So under the facts that we have here, the people would strongly urge this court to affirm the defendant's convictions and sentences. If you have any questions, I'll be more than happy to respond. Thank you, Mr. Goodman. Thank you. Counsel's mixing the judge's weighing of the evidence that was presented from the defense about Sam Trapps being at the scene and actually firing the gun, and trying to cross over and apply that to the Chambers analysis, there is a fundamental problem, and that is that the Chambers factors are to be weighed in an objective fashion. So the judge would be committing error, though he didn't even look at the factors in this case. If he had looked at the factors and said simply, well, I'm not finding that these factors are met because I'm not particularly impressed with the sources of the information about the date and nature of the circumstances under which Sam Trapps confessed, that would be error. And the cases say that. All the Illinois cases dealing with Chambers, a number of them point to the fact that it's improper for the judge to apply his own assessment of the believability of the proposed witnesses, that that goes to the weight of the admission testimony, not to its admissibility. And the only other thing that caught my attention, I thought was worthy of a response, is pointing out the reticence of the family members as if that somehow strengthens the state's case against Tyrone Hopkins. It's true that the children, the teenage witnesses, two of which were Tyrone's sons, waited until trial, until their dad was on the witness or defending himself from murder conviction to make their comments. But I think looking at their perspective, which was that they know that Tyrone didn't have a gun, Sam Trapps did, Sam Trapps fired the gun, Sam Trapps has been around the house taking the rap, saying, I'm not going to let Tyrone fall for this, that they could perceive that this is America. They're not going to be able to convict their dad if he's not the one who fired the weapon, and Sam Trapps is. And the gun's not been produced, and the defendant had no gunshot residue on his hands. There's no way they can find him guilty. And apparently, I just find the state's comments like, well, that's a flaw, because we can find people guilty who didn't do it. If you don't help us with the prosecution, we're going to put this on someone. And I think that's what happened in this case. Someone was found guilty because it was convenient to put the evidence on him. And it certainly is not the burden of the defendant to have to help the police in a prompt manner to avoid an unlawful conviction. Let me ask you that question about chambers, too. What do you perceive as the time that they're relatively quick response? Spontaneously and close in time, close proximity. There are cases... I mean, it's not necessarily within hours. There are cases that say a month is too long. Then there was the Tenney case, which, when I cite for the standard review, that it was a long time, nine months, I believe, and they pointed out, well, all four factors don't need to be met. And even though, in that case, it was a person that they actually tried and got a conviction against, and then the state moved to vacate the conviction so they could try Mr. Tenney. And the admission they got was in the course of prosecuting the other guy. But because it didn't need to be the unanimous finding of factors, then it was overlooked. So I think it's a little bit of a nebulous area that... Neither one of you want to draw bright lines. Oh, I don't know. I think it's a totality of circumstances. Okay. Thank you. We'll be taking the matter under advisement, conferring with our respective colleague, Justice McDade, and issuing a decision without undue delay.